UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ICARUS HOLDINGS 2, LLC,

       Plaintiff,

   v.

AMGUARD INSURANCE COMPANY,

       Defendant.

No. 20 CV 4334

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Icarus Holdings 2, LLC owned an apartment building, and insured it under a policy with defendant AmGUARD Insurance Company. The building's tenants moved out, and Icarus renovated the property. After renovations were complete, a pipe separated in one of the apartments causing water damage. Icarus filed a claim with AmGUARD, but the company denied coverage, citing the policy's vacancy condition and frozen plumbing exclusion. Icarus then filed this lawsuit, alleging that AmGUARD breached the parties' contract in bad faith. Both parties move for summary judgment. For the reasons that follow, the motions are granted in part and denied in part.

## I.    Legal Standards

A party moving for summary judgment must show there is no genuine dispute about any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party must demonstrate that, after construing all facts and drawing all reasonable inferences in favor of the nonmovant, a reasonable jury could

not return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Or the moving party must show that the nonmoving party has failed to establish an essential element of their case and could not carry their burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.    Facts

Icarus bought an apartment building on the south side of Chicago. *See* [44] ¶¶ 2–3, 5; [42] ¶ 12.[1] According to Icarus's managing member, [42] ¶ 3, Icarus intended to either hold the building as an income-generating rental property or renovate and sell. *Id*. ¶ 13. Icarus's property manager, *id*. ¶ 6, said that Icarus generally purchased, held, and sold real estate, and that renovating buildings was

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are taken from Icarus's response to AmGUARD's Local Rule 56.1 statement, [44], and AmGUARD's response to Icarus's Rule 56.1 statement, [42], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2).

part of the company's usual operations. *Id.* ¶ 14. An insurance broker said that Icarus told him that the building was "fully occupied" and directed him to purchase landlord's insurance. *See* [44] ¶ 6; [39-2] at 9, 81–82; [39-3]. Later, Icarus and the insurance broker discussed the possibility that the building could become vacant in the future. *See* [44] ¶ 7; [39-2] at 50–51, 82.[2]

AmGUARD issued a "Businessowner's Policy" to Icarus, providing property coverage for Icarus's building from October 2019 to October 2020. [44] ¶¶ 1–3; [42] ¶ 15; [1-1]. The policy declarations classified the building as "Apartment Buildings – 4 families or fewer – NO office occupancy" and characterized Icarus as "Lessors of Residential Buildings and Dwellings[.]" [44] ¶¶ 3–4; [1-1] at 3–5. The AmGUARD policy covered "physical loss" and "damage" to Icarus's building, and was limited to $520,000 in replacement costs. [42] ¶¶ 17–18, 21; [44] ¶ 2.

The policy contained an exclusion for "loss or damage caused directly or indirectly by" "Frozen Plumbing" meaning "water ... that leaks or flows from plumbing ... caused by or resulting from freezing unless" certain exceptions applied. [1-1] at 26, 29; [44] ¶ 56. The policy also included a vacancy condition:

**8. Vacancy**

   **a. Description Of Terms**

     (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs (a) and (b) below:

---

[2] I ignore plaintiff's additional fact—that the broker and Icarus's representatives talked about the building becoming vacant during a conversation about another insurance policy—because it doesn't controvert the fact that the broker and Icarus's member had the discussion. *See* N.D. Ill. Local R. 56.1(e)(2).

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:
...
(d) Water damage[.]

[44] ¶ 8; [1-1] at 36–37. Elsewhere in the policy, the word "operations" was defined as "your business activities occurring at the described premises," and "water damage" as "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance." [1-1] at 41–42; *see id.* at 13 (these definitions apply to "words and phrases that appear in quotation marks" in the policy, which have "special meaning").

4

In August 2019, Icarus decided to renovate and sell its building. [42] ¶ 25; *see* [44] ¶ 17. From August 24 to October 1, twenty-six percent of the building's total square footage was rented, and on October 1 the building's remaining tenant moved out, meaning that none of the building's square footage was rented. *See* [44] ¶¶ 18–23. Icarus's property management company hired a general contractor to renovate the basement, common hallway, first floor, and third floor. *See* [42] ¶¶ 4, 11, 27. The general contractor didn't complete the work itself, relying instead on subcontractors. [44] ¶ 37.

Bryan Heuer, co-owner of the general contractor, was at the building "about four times" in August and September of 2019, supervising and overseeing subcontractors. [42] ¶¶ 11, 29; [44] ¶ 39; [38-7] at 96. The general contractor received a deposit for renovation work on the hallway and upstairs units on August 20, and Heuer said that he thought the job took about a month to complete. *See* [44] ¶¶ 44–45; [42] ¶ 30; [38-7] at 45–47; [38-8] at 6. The general contractor received a deposit for renovations on the building's garden unit on September 4, and issued a related payment to a subcontractor on September 27. *See* [44] ¶ 46; [38-7] at 35; [38-8] at 3. Heuer said he thought the basement renovation work took about four weeks. *See* [44] ¶ 47; [42] ¶ 31; [38-7] at 108–09.[3] Heuer said that the subcontractors might have a

---

[3] Heuer lacked personal knowledge of the exact dates that the renovations were completed. *See* Fed. R. Evid. 602. Heuer didn't perform the work at Icarus's building, but did supervise subcontractors there, visited the building four times in August and September, and recorded deposit dates for the two projects (August 20 and September 4) and a final payment date for the work on the garden unit (September 27). *See* [44] ¶¶ 37, 43–47; [42] ¶¶ 29–31; [38-7] at 29–30, 34–35, 45–49, 96, 101–02, 105–06; [38-8]. Personal knowledge "can include reasonable inferences drawn from a witness's observations and firsthand experiences," *United States v.*

5

better idea of the days they worked, [44] ¶ 40; [38-7] at 109,[4] but the subcontractor who worked on the garden unit couldn't recall when they were at Icarus's building and had no records of the work. [44] ¶¶ 41–42. The renovations were completed no later than October 1. *See id.* ¶ 29; [42] ¶¶ 32, 34.

Icarus put its building up for sale in October 2019. [42] ¶ 34. In November, Icarus called an insurance adjuster, asking him to visit the building and investigate a water issue. *Id.* ¶¶ 9, 36. The adjuster said he received the call on November 22 or a few days before, and a mitigation specialist first visited the building on November 22. *See id.* ¶¶ 9, 36; [38-5] at 27–29, 32.[5] Inspections revealed that a copper plumbing

---

*Proano*, 912 F.3d 431, 441 (7th Cir. 2019) (citation omitted), but does not include speculations or "other intuitions, hunches, or rumor." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) (citation omitted). In this case, Heuer was speculating about when the work at Icarus's building was finished. *See* [38-7] at 45–47, 101–02, 106, 108–109; *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016); *Stagman v. Ryan*, 176 F.3d 986, 996 (7th Cir. 1999). Heuer didn't explain how he knew, based on his company's records, the precise dates the projects were completed. *See* [38-7] at 29–30, 34–35, 45–49, 101–02, 105–06, 108–09. Heuer's experience in his business and with the projects at Icarus's building also weren't sufficient to demonstrate personal knowledge of the precise days the work was completed. *See Widmar*, 772 F.3d at 460–61; *see also* Fed. R. Evid. 701 advisory committee note on 2000 amendment (discussing lost profits testimony, and explaining that "[s]uch opinion testimony is admitted ... because of the particularized knowledge that the witness has by virtue of his or her position in the business"); *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862–63 (7th Cir. 2009) (a founder of a company lacked personal knowledge to testify about lost profits related to a new product because his testimony wasn't based on his knowledge of the business); *c.f. Proano*, 912 F.3d at 441 (it was reasonable to infer, based on evidence about the homogeneity of an academy's teachings, that two instructors had personal knowledge about what a student learned there). But as discussed in the text at page 19, that doesn't mean that Heuer has no evidence from which Icarus can assert a material dispute.

[4] Heuer didn't say that only the subcontractor could identify when the renovation was completed. *See* [44] ¶ 40; [38-7] at 108–09. Heuer said was that the subcontractors would "maybe" have a better idea of the end date for their work, depending on how much time had passed. [38-7] at 109.

[5] Icarus's adjuster couldn't say for certain when he received the call about the water loss, but said that it was either on November 22 (as marked on the adjuster's file) or a few days before. *See* [38-5] at 28–29. The adjuster had personal knowledge of when he received the call, and

pipe in the building's third-floor ceiling separated at a joint, resulting in a leak that caused damage. [42] ¶¶ 39–44, [44] ¶¶ 10, 52–53. The plumber who repaired the pipe said that frozen pipes usually crack or break, not separate. *See* [42] ¶¶ 10, 46–49.

On November 25, Icarus reported the loss to its insurance broker. [42] ¶ 54; [39-4] at 2. AmGUARD assigned the claim to an independent claim adjustment company, which investigated the loss. [44] ¶¶ 48–54; [42] ¶¶ 55–60. AmGUARD's adjuster reviewed temperature records, inspected the building, and prepared a report, which he sent to AmGUARD and Icarus. [44] ¶¶ 49–54; [42] ¶¶ 58, 63.[6] AmGUARD's adjuster also prepared four additional reports between March and June 2020, which were largely identical to the initial report. [42] ¶ 67; [38-4] at 100.

Based on temperature records, the lack of tenants in the building, and a lack of evidence showing that heat had been maintained, AmGUARD's adjuster concluded that the water loss was caused by pressure from frozen water within the pipe system. [44] ¶ 54. The adjuster wrote that "[f]urther investigation into the date of loss and cause of loss may be required by an expert." [42] ¶ 63. AmGUARD's adjuster didn't

---

wasn't speculating. *See* Fed. R. Civ. P. 62; *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 7th Cir. 2014); 1 *McCormick On Evid.* § 10 (8th ed. Jan. 2020 Update) ("While the law demands firsthand observation, the law does not unrealistically insist on either precise perception or certainty in recalling the facts.").

[6] The adjuster could not remember speaking with his point of contact at Icarus during the pendency of the claim. [42] ¶¶ 61–62. The report prepared by AmGUARD's adjuster showed that he spoke with Icarus's public adjuster about the claim, *see* [39-18] at 8, but doesn't support the assertion that AmGUARD's adjuster interviewed employees from Icarus or Icarus's management company. *See* [44] ¶ 51. AmGUARD's adjuster never spoke to the plumber who fixed the pipe. [42] ¶¶ 10, 71. There's no evidence that supports the proposition that the adjuster continued to investigate the claim after preparing his report on January 31, 2020. *See* [44] ¶ 50; [39-18]; [38-4] at 70–71.

have a background in plumbing and said he wasn't an expert. *Id.* ¶ 68.[7] The adjuster also said that AmGUARD never retained an expert to determine the cause and date of the loss. *Id.* ¶ 72; [38-4] at 71–72.[8]

AmGUARD denied Icarus's claim on July 10, 2020. [42] ¶ 69. In its coverage denial letter, AmGUARD explained that it didn't have to pay for the loss because the building was vacant for more than sixty days prior to the loss and because the policy excluded damages caused by frozen plumbing. *See* [44] ¶¶ 55–56; [39-19] at 6. About two weeks after AmGUARD denied the claim, Icarus filed this lawsuit. [1].[9]

---

[7] Although an admitted non-expert, AmGUARD's adjuster never said he wasn't qualified or didn't have enough personal experience to determine the cause of the water loss. *See* [38-4] at 71–72, 103–104.

[8] That the adjuster said he wasn't an expert and had no training in plumbing doesn't mean he wasn't competent to testify or that his conclusions about what caused the water loss are inadmissible. *See* Fed. R. Evid. 601; 602; 701. AmGUARD's adjuster based his conclusion that the pipe had frozen on (1) his inspection; (2) discussions with Icarus's adjuster; (3) the absence of people in the building; (4) the lack of heat in certain parts of the building; and (5) outside temperature records during and leading up to the loss date. *See* [38-4] at 57, 113; [39-18] at 5–6. The adjuster's opinion wasn't based on scientific, technical, or other specialized knowledge, but on lay competence about what happens to pipes in unheated buildings during cold periods. *See* Fed. R. Evid. 701. That the adjuster didn't consider himself an expert and wasn't trained in plumbing goes to the weight of this evidence, rather than its admissibility. Icarus may move to exclude the adjuster's testimony on the causation question in the future, but his testimony is sufficiently grounded on lay experience to be admitted at this point in the case.

[9] Neither party was permitted to assert additional statements of fact under Local Rule 56.1(b)(3). [31]. Despite that restriction, AmGUARD responded to Icarus's 56.1 statements of fact with dozens of new facts. *See* [42] at 21–29, ¶¶ 1–32. AmGUARD argues that it didn't expect the frozen plumbing exclusion to be at issue in Icarus's motion for summary judgment and was therefore permitted to respond when plaintiff challenged that affirmative defense. *See* [47] at 2–4. But AmGUARD fails to explain how asserting additional statements was consistent with the court's order, which left no room for interpretation. *See* [31] ("[N]o party may assert additional statements of fact under Local Rule 56.1(b)(3) when responding to a motion for summary judgment."). That AmGUARD failed to anticipate an argument that Icarus made is no excuse for disregarding a court order. It asked for neither permission nor forgiveness. Plaintiff's motion to strike AmGUARD's additional statements of fact is granted, and I disregard defendant's additional statements.

### III. Analysis

Both parties move for summary judgment on Icarus's breach of contract claim. [37] at 4; [35] at 2, 9–16.[10] AmGUARD also moves for summary judgment on count two—Icarus's request for damages under § 155. [35] at 16. Icarus moves for summary judgment on twelve of AmGUARD's thirteen affirmative defenses. [37] at 4–14.

Under Illinois law, a court interpreting an insurance policy must determine and give effect to the parties' intent, and begins with the language of the agreement. *See Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 503 (2010) (quoting *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479 (1997)); *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021) (citation omitted). Clear and unambiguous terms are given their "plain, ordinary and popular meaning." *Founders Ins. Co. v. Munoz*, 237 Ill.2d 424, 436 (2010) (citation omitted); *Sproull v. State Farm Fire & Cas. Co.*, 451 Ill.Dec. 616, 622 (2021) (citation omitted). Ambiguous terms (those susceptible to more than one meaning) are construed strictly against the insurer who drafted the agreement. *Pekin*, 237 Ill.2d at 456 (quoting *Koloms*, 177 Ill.2d at 479). Provisions that limit or exclude coverage are read liberally in favor of the insured and "applied

---

[10] The court has jurisdiction under 28 U.S.C. § 1332(a) because plaintiff is a citizen of Illinois, New York, and California, *see* [1] ¶¶ 3–8; *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 533–34 (7th Cir. 2007), defendant is a citizen of Pennsylvania, *id.* ¶ 9, and the amount in controversy exceeds $75,000. *Id.* ¶ 20. Illinois law applies because federal courts sitting in diversity apply the substantive law of the forum state. *See Piltch v. Ford Motor Co.*, 778 F.3d 628, 631–32 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Parties waive any choice of law issue by submitting to Illinois law and relying solely on it. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citations omitted). Both parties argue that Illinois law should apply, *see* [35] at 9; [37] at 3, and that's enough to hold them to Illinois's rules for contract interpretation. *See McCoy*, 760 F.3d at 684; *Lott v. Levitt*, 556 F.3d 564, 567–68 (7th Cir. 2009).

only where [the] terms are clear, definite, and specific." *Berg v. New York Life Ins. Co.*, 831 F.3d 426, 429 (7th Cir. 2016) (quoting *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill.2d 381, 393 (2005)). The interpretation of an insurance policy is a question of law. *Sproull*, 451 Ill.Dec. at 623 (quoting *Addison Ins. Co. v. Fay*, 232 Ill.2d 446, 451 (2009)).

The parties agree that in November 2019 Icarus's apartment building was covered under AmGUARD's insurance policy, and that the water damage to the property was a "loss." *See* [44] ¶¶ 1–2, 9–10, 53; [42] ¶¶ 15, 17, 22, 38, 65–66. AmGUARD promised to pay for "direct physical loss of or damage to" Icarus's apartment building "caused by or resulting from any Covered Cause of Loss." [1-1] at 13; [42] ¶ 17. There's no dispute that—unless an exclusion or limitation applies and an exception does not apply—AmGUARD must pay Icarus for the water damage. *See* [37] at 4; [41] at 4–15.

## A.    The Vacancy Condition

AmGUARD bears the burden of proving that the vacancy condition[11] limits coverage for Icarus's claim. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins.*

_____

[11] The vacancy provision in the policy is styled as a "condition," not an exclusion. *See* [1-1] at 33 (the vacancy provision is listed in paragraph E, "Property Loss Conditions"). While the parties dispute whether the vacancy provision is a condition to coverage or an exclusion, *see* [37] at 8; [41] at 4, that dispute doesn't matter, because AmGUARD acknowledges that it bears the burden of proving that coverage is limited. *See* [41] at 7–8; [35] at 13; *see Old Second Nat. Bank v. Indiana Ins. Co.*, 390 Ill.Dec. 898, 907 (1st Dist. 2015) (characterizing a similar provision as a "condition subsequent" which "does not exclude coverage for a loss occurring when the covered premises are vacant, but rather relieves [the insurer] of the obligation to pay [the insured] for certain enumerated covered losses" if the vacancy condition occurs); *Harris Tr. and Sav. Bank v. Illinois Fair Plan Ass'n*, 68 Ill.App.3d 934, 937 (1st Dist. 1979) (characterizing a similar provision as a condition subsequent, which, when violated, suspends coverage "until such time as the breach ceases"); *see also* 16 *Williston on Contracts* § 49:87

10

*Co.*, 611 F.3d 339, 347 (7th Cir. 2010) (citing *Ins. Corp. of Hanover v. Shelborne Assocs.*, 389 Ill.App.3d 795 (1st Dist. 2009) and 17A *Couch on Insurance* § 254:13 (3d ed. Dec. 2021 update)); *see also Gillen*, 215 Ill.2d at 393–94. If AmGUARD shows that coverage is limited by the condition, Icarus bears the burden of showing that an exception (if any exists) preserves coverage. *See Santa's Best*, 611 F.3d at 347; *Wells v. State Farm Fire & Cas. Ins. Co.*, 447 Ill.Dec. 259, 267 (5th Dist. 2021).

It's undisputed that the policy was issued "to the owner or general lessee" of the building in question (and not to a tenant). [1-1] at 36; *see* [43] at 3; [35] at 9–10. The parties also agree that less than 31% of the building's total square footage was rented for the sixty-day period prior to the loss. *See* [44] ¶¶ 22–23. Whether the vacancy condition limits coverage over Icarus's claim turns on three issues: (1) whether Icarus used at least 31% of the building's square footage "to conduct its customary operations," (2) whether the building was "under construction or renovation," and (3) whether the loss constituted "water damage." [1-1] at 36–37; *see* [37] at 8–12; [35] at 9–16.

### 1. *"Used to conduct customary operations"*

If Icarus used at least 31% of the building's total square footage to "conduct its customary operations" in the sixty days prior to the loss, the building wasn't vacant, and the condition won't limit coverage. *See* [1-1] at 36. Icarus argues that it used the building for its customary operations between August and November 2019 by

---

(4th ed. Nov. 2021 update) (where an insurer claims that a condition excuses them from paying, courts characterize such conditions as conditions subsequent, and insurers bear the burden of proving that coverage is limited).

renovating the building, holding it, and listing it for sale. *See* [37] at 10–11; [43] at 8–11. Plaintiff contends that the word "customary" is undefined in the policy, but that the word "operations" is defined as "your business activities occurring at the described premises." [43] at 8 (quoting [1-1] at 41); [37] at 10. Alternatively, Icarus argues that the words "customary operations" are ambiguous and should be construed against the insurer. [43] at 9–10.

The vacancy condition appears in § 1, paragraph E of the policy, titled "Property Loss Conditions." *See* [1-1] at 33, 36–37. In § 1, paragraph H ("Property Definitions"), the word "operations" is defined as "your business activities occurring at the described premises." *Id.* at 41. The word "operations" in paragraph H appears in quotation marks, and a note at the start of the policy explains that "[W]ords and phrases that appear in quotation marks have special meaning. Refer to Paragraph H." *Id.* at 13.

The vacancy provision must be read in context. *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 998 (7th Cir. 2018) (citation omitted). Considering the whole of the policy, the paragraph H definition of "operations" isn't relevant to that word when used in paragraph E. The policy limits the application of paragraph H's definitions to those situations where the defined term appears in quotation marks. *See* [1-1] at 13, 17 (the word operations is in quotation marks in paragraph A, subsection f ("Business Income"); *see also Ten Pas v. The Lincoln Nat'l Life Ins. Co.*, No. 20-1259, 2022 WL 1074533, at *4–5 (7th Cir. April 11, 2022) (rejecting a reading of an insurance policy that sought to apply a definition of a term ("active work") in one section of a policy to

another term ("last day worked") in a different section). The word "operations" doesn't appear in quotation marks in the vacancy condition, *see* [1-1] at 36–37, and the explicit limitation on applying paragraph H's definitions shows that the parties didn't intend to extend that special definition to every use of the word in the policy. *See* [1-1] at 13.

Context also shows that "customary operations" can't mean making renovations. Interpreting "customary operations" to include making renovations would make the vacancy condition's clause on that subject ("Buildings under construction or renovation are not considered vacant") superfluous, which makes that reading unreasonable. *See* [1-1] at 36–37; *Berg v. New York Life Ins. Co.*, 831 F.3d 426, 430 (7th Cir. 2016) (quoting *Pekin Ins. Co. v. Wilson*, 391 Ill.App.3d 505 (5th Dist. 2009)) ("We will not interpret an insurance policy in such a way that any of its terms are rendered meaningless or superfluous").

Neither "customary" nor "operations" is defined in the vacancy condition, *see* [1-1] at 36–37, but that's not enough to make the term ambiguous. *See State Farm Mut. Auto. Ins. Co. v. Elmore*, 450 Ill.Dec. 513, 519 (2020) (citation omitted). Undefined terms in an insurance policy "are construed as an 'average, ordinary, normal, and reasonable person' would understand them." *Newman*, 885 F.3d at 998 (quoting *Gillen v. State Farm Mut. Auto Ins. Co.*, 215 Ill.2d 381, 393 (2005)); *Founders Ins. Co. v. Munoz*, 237 Ill.2d 424, 436 (2010) (citation omitted) (courts should look to dictionary definitions of undefined terms). The class and character of the property at issue—here an apartment building—is relevant to understanding what the parties

13

meant. *See Pekin*, 237 Ill.2d at 503 (quoting *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479 (1997)) ("A court must ... take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract."); *see also Est. of Luster v. Allstate Ins. Co.*, 598 F.3d 903, 908 (7th Cir. 2010) (applying Indiana law).

Dictionaries show that "customary" means "[i]n accordance with the usual practice or behaviour of a person or thing; habitual, typical, usual," *Customary*, Oxford English Dictionary Online, https://www.oed.com (last visited April 28, 2022), or "commonly practiced, used, or observed." *Customary*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/customary (last visited April 28, 2022). "Operation" means "the action of operating a ... business," *Operation*, Oxford English Dictionary Online, https://www.oed.com (last visited April 28, 2022), or "a business transaction." *Operation*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/operation (last visited April 28, 2022); *see also Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indem. Ins. Co.*, 462 Fed. App'x 70, 73 (2d Cir. 2012) (interpreting a similar vacancy provision, defining "customary" through a dictionary definition and "operations" with reference to the building in question). The policy declarations described Icarus's property as "Apartment Buildings – 4 families or fewer – NO office occupancy." [44] ¶ 3. The policy also said that Icarus was a lessor of residential buildings. *See id.* ¶ 4.[12]

---

[12] There's testimony from Icarus's representatives that holding and selling real estate was part of plaintiff's usual business model, and that it bought the building in question with an eye towards flipping the property for profit. *See* [42] ¶¶ 13–14. Icarus also communicated

In the context of the parties' agreement, "conduct customary operations" meant conducting ordinary business at an apartment building associated with leasing units to tenants. The business pursuit identified in the policy was the renting of apartments, not the sale of the building. *See* [44] ¶¶ 3–4. Customary operations, then, included work in support of renting the building like maintenance or cleaning, but not holding the property without tenants and listing it for sale. *See Oakdale Mall Assocs. v. Cincinnati Ins. Co.*, 702 F.3d 1119, 1124 (8th Cir. 2013) (a building owner trying to rent space wasn't using that space to conduct customary operations); *Keren*, 462 Fed. App'x at 72–73 (customary operations at a school were the instruction of students and didn't include a one-day meeting of teachers or the storage of school supplies); *Saiz v. Charter Oak Fire Ins. Co.*, Civil Action No. 06-cv-01144-EWN-BNB, 2007 WL 2701398, at *5 (D. Colo. Sept. 12, 2007), *aff'd*, 299 Fed. App'x 836 (10th Cir. 2008) (a restaurant owner didn't conduct customary operations when he used a portion of a building as an office to sell the building and work on other projects but not to run a restaurant).[13]

---

with its broker about the kind of insurance it wanted ("landlord's insurance"), and later told him about its intentions to sell the building and the fact that it might become vacant. *See* [44] ¶¶ 6–7. But the policy described Icarus as a lessor of residential buildings, and it's the policy that defines the business that AmGUARD insured.

[13] Excluding the listing of a building for sale from "customary operations" in the vacancy condition gives meaning to that provision, which limits the insurer's risk by covering the building when it is occupied but not when it is vacant. *See Camelback Properties v. Phoenix Ins. Co.*, No. 10 C 01467, 2012 WL 32965, at *6 (N.D. Ill. Jan. 6, 2012) (citing *Heartland Cap. Inv., Inc. v. Grange Mut. Cas. Co.*, No. 08-CV-2162, 2010 WL 432333, at *4 (C.D. Ill. Feb. 2, 2010)) ("The purpose of the vacancy provision is to exclude coverage from buildings that become a higher risk once they become unoccupied"); *see also Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 503 (2010) (quoting *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479 (1997))

Even if selling the property was a "customary operation," plaintiff hasn't offered evidence that it "used" any of the square footage of the building to conduct that operation. [1-1] at 36; *see* [42] ¶¶ 32, 34 (there's no evidence that Icarus's representatives were at the building to list it for sale or to show it, for example); *see also Saiz*, 2007 WL 2701398, at *5 (a building owner didn't conduct customary operations where the owner used an office but that space didn't occupy the required portion of the building's square footage); *cf. Cincinnati Ins. Co. v. KDL, Inc.*, CIVIL ACTION No. 12-4093-KHV, 2017 WL 2555952, at *2–4 (D. Kan. June 13, 2017) (a building owner who used almost all of a space for storage conducted customary operations); *Camelback Properties v. Phoenix Ins. Co.*, No. 10 C 01467, 2012 WL 32965, at *6 (N.D. Ill. Jan. 6, 2012) (a building owner who used office space to lease the property's units conducted customary business operations in that office space). Renovating, holding, and listing the building for sale weren't "customary operations."

2.      *"Under construction or renovation"*

The policy says that "[b]uildings under construction or renovation are not considered vacant." [1-1] at 36. The parties dispute whether this provision limits coverage or is an exception to the vacancy condition that would restore coverage. *See* [37] at 3; [35] at 13. If the "under construction or renovation" provision is part of the vacancy condition, AmGUARD has the burden of showing that the building wasn't under construction or renovation. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d

---

("A court must ... take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.").

456, 460 n.2 (7th Cir. 2019); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010) (citations omitted). If the provision is an exception, Icarus must prove the opposite. *See Santa's Best*, 611 F.3d at 347.

It's reasonable to interpret the construction or renovation provision as part of the vacancy condition (limiting coverage), not an exception. The vacancy condition is divided into two sections. *See* [1-1] at 36–37. The first part defines the term "vacant," and includes the renovation or construction provision. *Id.* ("Buildings under construction or renovation are not considered vacant."). The second part of the condition uses the term "vacant" to limit coverage for certain causes of loss. *Id.* ("If the building ... has been vacant for more than 60 consecutive days ... We will not pay for any loss or damage caused by any of the following"). That the renovation or construction provision appears in the policy *before* any limitation of coverage related to vacancy, and isn't set off by any word showing a contrast (like "but" or "unless"), distinguishes this case from those involving an exception. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, Case No. 13-cv-05463, 2017 WL 4278787, at *2 (N.D. Ill. Sept. 25, 2017), *aff'd*, 924 F.3d 456 (7th Cir. 2019) (policy announced an exclusion and then an exception: "but this exclusion does not apply" given certain conditions); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, No. 04 C 1342, 2008 WL 4328192, at *2 (N.D. Ill. Sept. 16, 2008), *aff'd in part, rev'd in part*, 611 F.3d 339 (7th Cir. 2010) (policy announced an exclusion and then an exception: "Nor will we apply this exclusion to" certain injuries); *Wells v. State Farm Fire and Cas. Ins. Co.*, 447 Ill.Dec. 259, 262, 266 (5th Dist. 2021) (policy announced an exclusion and then an exception:

"unless: (1) you do your best to maintain heat in the building or structure"); *Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 470 (7th Cir. 1986) (policy announced an exclusion and then an exception: "but a building in process of construction shall not be deemed vacant"). Similarly, although the policy in *Liberty Mut. Ins. Co. v. Blandford*, Civil Action No. 3:98CV-6-S, 1999 WL 33756670, at *2–4 (W.D. Ky. Sept. 1, 1999), used similar language ("Buildings under construction are not considered vacant"), it placed that term after announcing a complete exclusion. Here, the policy placed the construction-or-renovation term before completing the definition of vacancy. That makes the entire provision a single condition.[14]

The vacancy condition limits coverage, and it's at least ambiguous as to whether the renovation or construction provision is part of the condition or an exception to it. *See Berg v. New York Life Ins. Co.*, 831 F.3d 426, 430 (7th Cir. 2016) (quoting *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill.2d 381, 393 (2005)) (provisions that limit or exclude coverage are read liberally in favor of the insured and "applied only where [the] terms are clear, definite, and specific"); *Sproull v. State Farm Fire and Cas. Co.*, 451 Ill.Dec. 616, 622 (2021) (citation omitted) (ambiguities are construed against the insurer). The burden is on the insurance company to demonstrate the application of the vacancy condition, including the renovation term.

---

[14] Icarus is more likely to have the relevant information about whether the building was under construction or renovation during the sixty days prior to the loss. *See* [35] at 13 (quoting *Wells v. State Farm Fire & Cas. Ins. Co.*, 447 Ill.Dec. 259, 267 (5th Dist. 2021)). But defendant should have drafted the policy more carefully—and made clear that the "renovation or construction" provision was an exception—if it wanted plaintiff to bear the burden on this point. *See Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill.2d 381, 393 (2005); *Sproull v. State Farm Fire and Cas. Co.*, 451 Ill.Dec. 616, 622 (2021).

18

Because the building was not occupied with tenants and Icarus was not otherwise using the building for its customary business operations, AmGUARD must show that the building wasn't under construction or renovation for the sixty days prior to the loss. *See* [1-1] at 36–37; *Varlen Corp.*, 924 F.3d at 460 n.2.

It's undisputed that the loss occurred on November 22 or a few days earlier. *See* [42] ¶ 36; [44] ¶ 13; [38-5] at 27–29, 32. That sets the sixty-day window to September 23 or a few days earlier. The parties agree that the renovations other than in the garden unit were completed no later than September 20. *See* [42] ¶ 30. Icarus's representative said all of the renovation work was completed by October 1. [44] ¶ 29. The subcontractor who completed the work on the building's garden unit couldn't remember the dates they worked or when they completed the work. [44] ¶ 41. Icarus's contractor received a deposit for the garden-unit work on September 4, issued a related payment to a subcontractor on September 27, and said that the job took about four weeks. *See* [44] ¶¶ 46–47; [42] ¶ 31; [38-7] at 35, 108–09; [38-8] at 3. Taken together, this evidence shows that there's a genuine material dispute as to whether the building was under renovation or construction (and therefore not vacant) in the sixty days prior to the loss.[15]

---

[15] *Myers* involved an exception for "construction" and there was no evidence of construction work during the period in question. *See Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986). In this case, it's reasonable to infer—based on Icarus's contractor's records and estimate of how long the garden-unit work took—that renovations were ongoing as of September 23, 2019. Considering Icarus's motion, it's also reasonable to infer that the work wasn't ongoing as of that date. The issue boils down to the weight to be given to ambiguous evidence about what was happening around September 23, and even on cross-motions for summary judgment, a court cannot weigh the evidence.

3.    *"Water damage"*

Icarus argues that the loss in question doesn't fall under the vacancy condition because it wasn't "water damage." *See* [37] at 11–12; [43] at 11–12. Relying again on a definition in another section of the policy, Icarus argues that "water damage" in the vacancy condition means "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance ... containing water or steam." *See* [43] at 11 (citing [1-1] at 42). Because the pipe at its building separated, *see* [44] ¶ 52; [42] ¶ 49, Icarus reasons that the damage it suffered wasn't "water damage," and so coverage wasn't limited by the vacancy condition. *See* [37] at 11–12; [43] at 11–12. Alternatively, Icarus argues that the term "water damage" in the vacancy condition is ambiguous. *See* [43] at 12.

Icarus's argument for applying the definition of "water damage" from paragraph H to the vacancy condition in paragraph E fails for the reasons discussed above. *See supra* at 12. Water damage wasn't itself defined in paragraph H, but was instead part of the definition of "Specified causes of loss," a term with a "special meaning" used elsewhere in the policy. *See* [1-1] at 13, 42. Importing part of a definition of another term ("Specified causes of loss") into an unrelated section where the "special definition" from paragraph H isn't being used isn't a reasonable interpretation of the policy. *See Founders Ins. Co. v. Munoz*, 237 Ill.2d 424, 433 (2010).

The term "water damage" is undefined in the vacancy condition. *See* [1-1] at 36–37. Read in context, the term isn't ambiguous, and means damage caused by

water.[16] "Water damage" as it appears in the vacancy condition isn't limited to circumstances that only involve pipes that crack or break apart. *See id.* Even if the term were limited in that way, the term "break" includes separation. *Break*, Oxford English Dictionary Online, https://www.oed.com (last visited April 28, 2022) ("To sever into distinct parts by sudden application of force"); *Break*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/break (last visited April 28, 2022) ("to separate into parts with suddenness or violence"). A jury could conclude that the loss in question—buckled flooring, widespread damage, and water throughout the building caused by water that escaped from a separated pipe—was "water damage" under the policy's vacancy condition. *See* [42] ¶¶ 36, 38–40, 48–49; [44] ¶¶ 10, 52–54.

A jury could find that the vacancy condition applied to Icarus's claim, and therefore AmGUARD didn't owe Icarus for the loss. Plaintiff's motion for summary judgment on liability for the contract claim and on the vacancy condition affirmative defense is denied.

---

[16] Icarus is right that the policy is redundant because the vacancy condition repeats the word "damage." *See* [1-1] at 36–37 ("We will not pay for any loss or damage caused by ... (d) Water damage"). But reading "water damage" to mean damage caused by water is the natural interpretation, and nothing in the vacancy condition suggests the parties intended to limit the kind of water damage losses that would be excluded under the condition. *See id.*

### B.    Other Affirmative Defenses

AmGUARD raised eleven other affirmative defenses to Icarus's contract claim. *See* [13] at 8–10, ¶¶ 1—10, 12.[17] Icarus moves for summary judgment on all of them. *See* [37] at 4–14.

AmGUARD's seventh affirmative defense is that the loss wasn't covered because it fell under the policy's frozen plumbing exclusion. *See* [13] at 9, ¶ 7. The policy excluded loss or damage caused by "water ... that leaks or flows from plumbing ... caused by or resulting from freezing." [1-1] at 26, 29. Icarus's plumber said the loss was caused by poor soldering. *See* [42] ¶ 49. Defendant's adjuster concluded that the loss was caused by frozen plumbing. *See* [44] ¶ 54; [39-18] at 5 ("It is our opinion that [the loss] is a result of a separated solder joint as a result of freezing within the line."). This material dispute as to the cause of the loss means that summary judgment is inappropriate. *See Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018)).

Icarus challenges all of AmGUARD's other affirmative defenses. *See* [37] at 4–14. By failing to make any arguments in response, *see* [41], AmGUARD waived those defenses to the contract claim. *See Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th

---

[17] AmGUARD alleged the following defenses: (1) failure to state a claim upon which relief can be granted; (2) that the coverage was "subject to all of the terms, conditions, exclusions and limitations" of the policy; (3) that the claim was subject to the property deductible; (4) that the claim was subject to the policy's limit of liability; (5) that Icarus failed to mitigate damages; (6) that the loss was subject to a water exclusion; (7) that the loss was subject to a frozen plumbing exclusion; (8) that the loss was subject to an exclusion for continuous or repeated seepage or leakage of water; (9) that the loss was subject to weather exclusion; (10) that the loss was subject to an exclusion for negligent work; and (11) that the loss was subject to an exclusion for neglect. [13] ¶¶ 1–10, 12.

Cir. 2017) (a party waives "underdeveloped" arguments at summary judgment); *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'").

Icarus's motion for summary judgment is granted as to affirmative defenses one through six and eight through ten. Plaintiff's motion is denied as to the seventh affirmative defense: the frozen plumbing exclusion. Because disputes remain as to whether either the vacancy condition or the frozen plumbing exclusion applies, AmGUARD's motion for summary judgment on the contract claim is denied.

## C.    Section 155

Section 155 damages are appropriate if an insurer's actions with respect to a claim made under a policy are "vexatious and unreasonable." 215 ILCS 5/155. Section 155 does not create a cause of action but rather "provides an extra-contractual remedy for policyholders." *Creation Supply, Inc. v. Selective Ins. Co. of the Southeast*, 995 F.3d 576, 579 (7th Cir. 2021) (quoting *Cramer v. Ins. Exch. Agency*, 174 Ill.2d 513 (1996)). "[A]n insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage, (2) the insurer asserts a legitimate policy defense, (3) the claim presents a genuine legal or factual issue regarding coverage, or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (citations omitted). Whether an insurer's conduct was unreasonable or vexatious under § 155

23

is a question of fact. *Med. Prot. Co. v. Kim*, 507 F.3d 1076, 1086 (7th Cir. 2007) (citations omitted).

AmGUARD hasn't shown that it didn't owe coverage under the policy, and therefore isn't entitled to summary judgment under § 155 on that basis. But AmGUARD also argues that its denial was grounded on a bona fide dispute about coverage. *See* [35] at 16. Icarus contends that defendant acted unreasonably and vexatiously by (1) failing to diligently investigate or reasonably evaluate the claim; (2) refusing to resolve the claim in a timely manner; and (3) failing to provide a reasonable explanation for the denial. *See* [43] at 14.

When AmGUARD denied coverage, the insurer took the position that coverage was excluded or limited. *See* [44] ¶ 55; [39-19]. AmGUARD reasoned that frozen plumbing caused the loss, and that the building had been vacant for more than sixty days prior to the loss. *See* [39-19] at 6. AmGUARD's adjuster inspected the building on November 27, prepared reports, reviewed temperature records, and determined that the loss was caused by frozen plumbing. *See* [44] ¶¶ 48–54. During his inspection, AmGUARD's adjuster noticed that some of the building appeared to be recently remodeled. *See* [42] ¶ 60. The adjuster wrote that "[f]urther investigation into the date of loss and cause of loss may be required by an expert," and didn't speak with Icarus's representative about the claim. *Id.* ¶¶ 61–63. AmGUARD's adjuster didn't have a background in plumbing, said that he wasn't an expert, and said that AmGUARD never retained an expert to determine the cause and date of the loss. *Id.* ¶¶ 68, 72.

Defendant reasonably relied on the analysis of its adjuster, and wasn't required to retain an expert even after the adjuster suggested that step. *See* [42] ¶ 63. That Icarus's plumber reached a different conclusion about the cause of the damage, *see id.* ¶ 47, didn't make it unreasonable for AmGUARD to rely on its adjuster's conclusions, even though its adjuster said he wasn't an expert. The adjuster explained the investigation to AmGUARD, and passed along the observation that the property appeared to be vacant at the time of the loss. *See* [39-18] at 5; [44] ¶ 50. AmGUARD's analysis, while not as thorough as it could have been, was reasonable under the circumstances, and defendant's denial letter provided an adequate explanation. *See* [39-19]. AmGUARD's interpretation of the vacancy condition as an exception was incorrect, as discussed, but that interpretation wasn't unreasonable.

There's a bona fide dispute concerning the scope and application of coverage.[18] AmGUARD has asserted legitimate policy defenses in the form of the vacancy

---

[18] That seven months elapsed between the loss and AmGUARD's denial, *see* [44] ¶¶ 48, 55, 58, isn't enough to show vexatious or unreasonable delay where a bona fide dispute about coverage exists. *See Bedoya v. Illinois Founders Ins. Co.*, 293 Ill.App.3d 668, 679 (1st Dist. 1997); *Indus. Enclosure Corp. v. Northern Ins. Corp. of New York*, No. 97 C 6850, 1998 WL 852845, at *6–7 (N.D. Ill. Nov. 30, 1998); *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). While AmGUARD in its answer raised more than the two defenses cited in its denial letter, *see* [13]; [39-19], that's not a basis for sanctions under § 155, either. *See Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012) (the "mend the hold" doctrine does not forbid a defendant from adding defenses after being sued). *Peoria Property Investments* is distinguishable, because the defendant in that case changed its defense in the course of litigation. *Peoria Prop. Inv. LLC v. Cincinnati Indem. Co.*, Case No. 19-cv-1198-JES-TSH, 2021 WL 2598756, at *20 (C.D. Ill. April 15, 2021). Icarus argues that because AmGUARD's adjuster never recommended that defendant execute a non-waiver agreement or issue a letter reserving its rights, there can't be a bona fide dispute. *See* [43] at 15. But the facts don't show that AmGUARD never executed a non-waiver agreement or issued a reservation of rights letter, *see* [42] ¶¶ 74–75, and Icarus hasn't shown that AmGUARD waived its rights to deny coverage or should be estopped from doing so. *See Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 590 (7th Cir. 1993) (citations omitted)

condition and frozen plumbing exclusion, both of which present genuine factual issues regarding coverage. AmGUARD's argument shows a disagreement that is "real, actual, genuine, and not feigned," *Am. States Ins. Co. v. CFM Constr. Co*, 398 Ill.App.3d 994, 1003 (2nd Dist. 2010) (quoting Black's Law Dictionary 177 (6th ed. 1990)) (cleaned up), and Icarus hasn't shown evidence from which a jury could conclude otherwise. AmGUARD's motion for summary judgment on Icarus's bad faith claim under § 155 is granted.

## IV.   Conclusion

AmGUARD's motion for summary judgment, [34], is denied with respect to Icarus's breach of contract claim. The motion as to relief under § 155 is granted. Icarus's motion for partial summary judgment, [36], is denied as to its breach of contract claim, the frozen plumbing exclusion, and the vacancy condition affirmative defenses. Icarus's motion is granted as to the other affirmative defenses. Icarus's motion to strike, [45], is granted.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  May 5, 2022

---

(to show waiver, a party must point to words or actions that manifest an insurer's intention to waive its rights; to show estoppel, an insured must show that it was misled and prejudiced).

26